IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TEENA R. BOWERS,                )
                                )
                Plaintiff,       )
                                )       No.  CV-09-77-HU
        v.                       )
                                )
MICHAEL J. ASTRUE,              )
Commissioner of Social          )       FINDINGS & RECOMMENDATION
Security,                       )
                                )
                Defendant.       )
_____)

David B. Lowry
9900 S.W. Greenburg Road
Columbia Business Center, Suite 130
Portland, Oregon 97223

    Attorney for Plaintiff

Dwight C. Holton
ACTING UNITED STATES ATTORNEY
District of Oregon
Adrian L. Brown
ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2902

/ / /

/ / /

/ / /

/ / /

1 - FINDINGS & RECOMMENDATION

Michael S. Howard
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Office of the General Counsel
Social Security Administration
701 5th Avenue, Suite 2900, M/S 901
Seattle, Washington 98104-7075

     Attorneys for Defendant

HUBEL, Magistrate Judge:

     Plaintiff Teena Bowers brings this action for judicial review of the Commissioner's final decision to deny supplemental security income (SSI). This Court has jurisdiction under 42 U.S.C. § 405(g) (incorporated by 42 U.S.C. § 1383(c)(3)). I recommend that the Commissioner's decision be reversed and remanded for further proceedings.

                    PROCEDURAL BACKGROUND

     Plaintiff applied for SSI on August 4, 2003, alleging an onset date of December 6, 2001. Tr. 45-46. Her application was denied initially and on reconsideration. Tr. 29-32.

     On September 19, 2006, plaintiff, represented by counsel, appeared for a hearing before an Administrative Law Judge (ALJ). Tr. 635-76. On March 29, 2007, the ALJ found plaintiff not disabled. Tr. 13-28. The Appeals Council denied plaintiff's request for review of the ALJ's decision. Tr. 5-7.

                     FACTUAL BACKGROUND

     Plaintiff alleges disability based on osteomyelitis of the spine and hips, as well as mental problems. Tr. 67. At the time of the September 19, 2006 hearing, plaintiff was forty-four years old. Tr. 638. Plaintiff has seven years of education with little or no training or education since seventh grade. Tr. 639. Plaintiff has no past relevant work. Tr. 26.

2 - FINDINGS & RECOMMENDATION

I.  Medical Evidence

     In July 1996, plaintiff went to the Emergency Department of Salem Hospital complaining of back pain.  Tr. 588.  Plaintiff was assessed as having a possible urinary tract infection, a lumbosacral strain, a possible herniated disk, and possible pyelonephritis.[1]  Tr. 589.  Her urine drug screen was positive for cocaine, opiates, and barbituates.  Id.; Tr. 619.  She was treated with a variety of intravenous (IV) medications and was discharged home with antibiotics and pain medication, and advice to rest, use warm packs, push fluids, and follow up with her regular physician. Tr. 589.

     On October 25, 1996, plaintiff was admitted to Salem Hospital for vertebral osteomyelitis.[2]  Tr. 598.  The Salem Hospital records refer to three prior admissions to a Stayton, Oregon hospital for back pain between July 1996, when she went to the Salem Hospital Emergency Department, and October 25, 1996, when she was admitted to Salem Hospital.  Id.

     Upon admission, plaintiff underwent an MRI of her back which demonstrated evidence of diskitis at L5-S1[3], with bone destruction of L5 and S1, as well as a paravertebral mass.  Id.; see also Tr. 236-37 (MRI report).  The history and physical report on the day of admission notes that plaintiff had a history of IV drug abuse and

     [1]  Pyelonephritis is the inflammation of the kidney and pelvis.  Taber's Cyclopedic Medical Dictionary 1195 (Clayton Thomas ed., F.A. Davis, 14th ed. 1981).

     [2]  Osteomyelitis is the inflammation of the bone, especially the marrow, caused by a pathogenic organism.  Taber's at p. 1009.

     [3]  Diskitis is the inflammation of a disk.  Taber's at p. 420.

3 - FINDINGS & RECOMMENDATION

1  was currently using heroin.  Tr. 601.  During her hospitalization,
2  she underwent aspiration of her back under CT guidance.  Tr. 598.
3  Cultures showed that the vertebral osteomyelitis was caused by a
4  staph aureus infection for which plaintiff was treated with IV
5  antibiotics.  Tr. 598-99.  Plaintiff was discharged from the
6  hospital on November 11, 1996, and was transferred to a nursing
7  home for four weeks to continue receiving IV antibiotics.  Tr. 598-
8  99.  She was then to continue taking an antibiotic for another
9  three to six months.  Id.

10     The discharge summary of this hospitalization notes that
11  plaintiff was initially treated with long-acting morphine and then
12  elected to go into a methadone program.  Tr. 599.  An office visit
13  note by Dr. John C. Girod, M.D. on December 20, 1996, indicates
14  that plaintiff reported compliance with her methadone program.  Tr.
15  245.  The same note was made by Dr. Girod on January 7, 1997.  Tr.
16  244.  At that time, he noted that she was doing very well and that
17  her back pain had significantly decreased.  Id.  On March 25, 1997,
18  Dr. Girod noted that plaintiff was distraught and upset for a
19  number of reasons, including that she was going to jail which meant
20  she would have to be taken off of methadone.  Tr. 243.  Dr. Girod
21  instructed her to stop taking antibiotics.  Id.  He renewed
22  prescriptions for ibuprofen, trazadone (an anti-depressant), and
23  Benadryl (an antihistamine).  Id.

24     In July 1999, plaintiff started counseling with Christine
25  Ertl, LCSW, at Valley Mental Health.  Tr. 623-28.  A treatment plan
26  was developed to address plaintiff's anxiety and her polysubstance
27  abuse.  Tr. 624.  Plaintiff's initial diagnoses were substance
28  abuse in early full remission, and adjustment disorder with

4 - FINDINGS & RECOMMENDATION

1   anxiety.    Tr. 266.    Plaintiff  initially  attended  treatment
2   sporadically, but after moving to Salem, she kept more regular
3   appointments.    Id.    After working with plaintiff for several
4   months, Ertl dropped plaintiff's substance abuse disorder as a
5   diagnosis because it was no longer a focus of treatment.    Id.  She
6   also changed plaintiff's adjustment disorder to a generalized
7   anxiety disorder.    Id.

8       Ertl explained that plaintiff became overwhelmed with
9   apprehension and worry, which then affected her ability to
10  concentrate, increasing her irritability and sense of "feeling
11  keyed up."  Id.  Ertl noted that plaintiff showed "resiliency and
12  progress in treatment" by finding housing and employment.  Id.  She
13  recommended that plaintiff remain in treatment for her anxiety.
14  Id.

15      Progress notes from Ertl's sessions with plaintiff begin on
16  July 8, 1999, and end on May 5, 2000.  Tr. 255-65.  A termination
17  summary, dated February 1, 2001, and signed by Ertl, states that
18  the dates of service were July 8, 1999, to August 9, 2000, with
19  twenty-five sessions.    Tr. 623.    The reason for termination was
20  that plaintiff failed to return.  Id.  Ertl noted that progress in
21  meeting plaintiff's treatment goals was minimal due to plaintiff's
22  intermittent attendance and her on-going involvement with a violent
23  partner.  Id.  Ertl's records do not show, one way or the other,
24  whether plaintiff's drug use continued during plaintiff's treatment
25  with Ertl.

26      On August 6, 2002, plaintiff went to the Urgent Care
27  Department of Salem Hospital after having been assaulted by her
28  husband.  Tr. 617-18.  The physical examination revealed numerous

5 - FINDINGS & RECOMMENDATION

bruises and hematomas on plaintiff's scalp and face, and swelling of the forehead. Tr. 617. She also had scattered bruises on her extremities. Id. A review of an x-ray from a "couple of months ago" showed a nondisplaced fracture of one of plaintiff's lower lumbar vertebra pedicle. Id. She was told to use an ice bag on the painful areas, and was prescribed Vicodin for pain. Tr. 617-18. She was referred to the on-call orthopedic surgeon to address her back. Tr. 618. The Administrative Record contains no reports of any such consultation at that time.

On July 17, 2003, eleven months later, plaintiff was seen in the Santiam Memorial Hospital Emergency Department. Tr. 283-87, 416-17. Plaintiff's chief complaint was right hip pain and back pain. Tr. 284-85. Plaintiff recited her history of osteomyelitis and complained of having had several weeks of increasing back and hip pain. Tr. 284. But, the night before she went to the Emergency Department, she had been pushed by an ex-boyfriend into a table. Id. The record notes plaintiff's history of IV drug use and states that she denied recent IV drug use, but admitted to recent use of methamphetamines. Id. According to the emergency room report, an x-ray of her lumbosacral spine showed mild degenerative joint disease at L4-5 with no other obvious abnormalities. Id. An x-ray of her right hip was within normal limits. Id.

Plaintiff reported increased low back pain for the last two or three days, with difficulty walking, moving, or turning. Id. Her pain worsened when she was pushed to the floor by her "significant other." Id. She complained of severe right hip pain and low back pain. Id.

6 - FINDINGS & RECOMMENDATION

1    In examining plaintiff's low back, hips, and pelvic girdle,

2 Dr. Charles Stringham, M.D., noted that plaintiff moaned and

3 groaned and loudly screamed with any palpation or touching of the

4 hip area.  Id.  Any movement of the legs causing movement of the

5 hips was met with "resistance, profanity, and various verbal

6 assaults."  Id.

7    Plaintiff received a total body bone scan, which was normal,

8 as well as other radiological studies of the lumbosacral spine,

9 pelvis, and hips.  Tr. 286.  The radiologist orally reported to Dr.

10 Stringham that the back x-ray showed effusion of L5-S1 from

11 diskitis and some bony loss, but nothing acute.  Id.  The pelvis

12 and hip studies showed no acute abnormalities.  Id.

13    Drug tests performed while at the Emergency Department were

14 positive for methamphetamines and opiates.  Id.  However, Dr.

15 Stringham noted that plaintiff had received opiates in the

16 emergency room.  Id.

17    According to Dr. Stringham, plaintiff had a "protracted

18 course" in the emergency room.  Id.  She received several different

19 medications.  Id.  She was evaluated several times and her story

20 and pain frequently changed.  Id.  However, she had a fever of

21 101.4 and continued to feel warm and have diffuse pain.  Id.  She

22 was difficult to evaluate well with regard to soft tissue pain,

23 musculoskeletal pain, and abdominal pain because of her hyper-

24 responsiveness.  Id.

25    Dr. Stringham consulted with "backup physician" Dr. Katie

26 Houts, M.D., about the appropriate course of treatment for

27 plaintiff.  Id.  Dr. Houts believed that transfer to a

28 multispecialty center was appropriate.  Id.  Plaintiff was then

7 - FINDINGS & RECOMMENDATION

1   transferred to Providence Medical Center, in care of Dr. Sarah
2   Slaughter, M.D.   Id.   In his summary, Dr. Stringham noted that
3   plaintiff was frequently hostile and verbally abusive.   Id.   She
4   reluctantly agreed to go to Providence Medical Center.   Id.   Dr.
5   Stringham did not believe that plaintiff's history and presentation
6   was entirely reliable, but, he noted that she had various objective
7   findings that were "quite worrisome."   Id.

8       Plaintiff was admitted to Providence Medical Center on July
9   18, 2003, and discharged on August 2, 2003.  Tr. 288.  While there,
10  she had an MRI of her pelvis and lumbar spine which showed no
11  abscesses.  Tr. 289.  The MRIs suggested a myositis along her right
12  piriformis muscle.[4]   Id.; Tr. 313-14.   The principal final
13  diagnosis was methicillin-sensitive Staphylococcus aureus
14  bacteremia.[5]  Tr. 288.  While in the hospital, she received IV
15  antibiotics.  Id.  The hospital's psychiatric staff also diagnosed
16  her with major depressive disorder with psychotic features.  Id.

17      Before discharge, a peripherally inserted central catheter
18  (PICC) line was inserted so that plaintiff could continue to
19  receive IV antibiotics as home, monitored by the hospital's home

20

21      [4] Myositis is an inflammation of muscle tissue.  Taber's at
22  p. 928.  The piriformis muscle is a muscle that begins at the
    front surface of the sacrum and passes through the greater
23  sciatic notch to attach to the top of the thigh bone.
    www.medterms.com.
24

25      [5] Bacteremia is the presence of bacteria in the blood.
    Taber's at p. 153; see also "sepsis" which is a "[p]athological
26  state, usually febrile, resulting from the presence of
    microorganisms or their poisonous products in the blood stream
27  [and which] [m]ay be manifested as . . . . bacteremia (widespread
    dissemination by way of the blood stream) [and] commonly called
28  blood poisoning."  Id. at p. 1298.

8 - FINDINGS & RECOMMENDATION

1  health staff. Tr. 288-89. She was to continue with that treatment
2  until August 15, 2003. Tr. 289. She received several medications
3  upon discharge, including an anti-depressant (citalopram/Celexa),
4  an anti-anxiety medication (lorazepam), and pain medications
5  (morphine, oxycodone, and Tylenol). Id.

6      While she was an inpatient at Providence Medical Center,
7  plaintiff was treated by Dr. Sarah Slaughter, M.D., who continued
8  to treat her for a few weeks after plaintiff's discharge on August
9  2, 2003. Tr. 323-28. At an August 12, 2003 office visit following
10  her hospitalization, Dr. Slaughter reported that plaintiff was
11  taking an anti-psychotic medication, as well as the anti-
12  depressant, and was also taking naproxen and Neurontin for pain.
13  Tr. 332. Dr. Slaughter noted plaintiff's report of continued right
14  buttock pain, particularly with ambulation. Id. Dr. Slaughter
15  prescribed continued oral antibiotics for an additional eleven
16  days. Id.

17      In her second and final follow-up visit, on August 26, 2003,
18  plaintiff reported doing quite well and "feeling better than she
19  has in her entire life." Tr. 325. Her temperature had been normal
20  and she believed that the combination of the anti-psychotic, anti-
21  depressant, and anti-anxiety medications she had been taking were
22  "working wonderfully." Tr. 326. She reported slightly improved,
23  but still present, right buttock and lower back pain. Id.

24      On October 16, 2003, Disability Determination Services (DDS)
25  non-examining physician Dr. Richard Alley, M.D., completed a
26  physical residual functional capacity assessment of plaintiff. Tr.
27  372-80. Dr. Alley assessed plaintiff as having the ability to
28  occasionally lift or carry 20 pounds, frequently lift or carry 10

9 - FINDINGS & RECOMMENDATION

pounds, stand or walk for at least 2 hours in an 8-hour workday, and sit for a total of 6 hours in an 8-hour workday.   Tr. 373. There were no limitations on pushing or pulling.   Id.   There were also no postural, manipulative, visual, communicative, or environmental limitations.   Tr. 374-76.

Also on October 16, 2003, DDS non-examining psychologist Frank Lahman, Ph.D., completed a psychiatric review technique form regarding plaintiff in which he indicated that plaintiff suffered from an affective disorder.   Tr. 342.   He further noted the presence of major depression with psychosis.   Tr. 345.   However, he found very few functional limitations as a result of these diagnoses.   Tr. 352-56.   He noted only mild limitations in difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace.   Tr. 352.

Plaintiff went to Providence Medical Center's Emergency Department on September 23, 2004, for shoulder pain.   Tr. 358. Plaintiff indicated that she had been experiencing intermittent left shoulder pain for three months and she was concerned about a reoccurrence of osteomyelitis.   Id.   She denied using any IV drugs. Id.

On physical examination, the emergency room physician indicated that plaintiff had multiple scarring all over her four extremities from her past IV drug use.   Tr. 359.   But, he found no active track marks.   Id.   Based on a shoulder x-ray taken while in the emergency room, and his physical examination, the physician found no evidence of osteomyelitis and thus, he determined it was reasonable to send her home without any antibiotics.   Tr. 359-60.

Plaintiff reported that she had not recently been taking her

10 - FINDINGS & RECOMMENDATION

prescribed medications of morphine, oxycodone, anti-psychotic (olanzapine/Zeprexa), and anti-depressant (citalopram/Celexa) medications because she had run out of them.  Tr. 358.  She was restarted on the psychiatric medications (olanzapine/Zeprexa and citalopram/Celexa) and oxycodone upon discharge, and told to follow up with Dr. Slaughter and Cascadia Behavioral Health.  Tr. 360.

On October 18, 2004, plaintiff's mental status was evaluated, at the request of DDS, by Maribeth Kallemeyn, Ph.D.. Tr. 365-71. At the time, plaintiff was homeless and not working.  Id.  She indicated that in the past, she had had many jobs, but could never keep them.  Tr. 366.  She reported that in 2001, she cleaned motel rooms part-time, but had to quit because she had pain when bending and "[i]t wasn't worth it."  Id.

Dr. Kallemeyn noted that plaintiff's self-report and her medical records indicated a history of severe polysubstance abuse, with opiod and methamphetamine dependence.  Tr. 369.  Although Dr. Kallemeyn found plaintiff's reporting inconsistent, and thus did not consider plaintiff a reliable historian about this issue, Dr. Kallemeyn found plaintiff's report of using crystal meth as recently as three months ago, notable.  Id.  Additionally, plaintiff's self-report during the evaluation suggested the presence of paranoid ideation, auditory hallucinations, and depressive symptoms.  Id.

Although plaintiff's "clinical picture" was clouded by her substance abuse, Dr. Kallemeyn diagnosed plaintiff as suffering from psychotic disorder NOS and depressive disorder NOS.  Tr. 370. Dr. Kallemeyn noted plaintiff's report that she thought more clearly while taking the anti-depressant and anti-psychotic

11 - FINDINGS & RECOMMENDATION

1  medications she had previously taken.    Id.

2      Dr. Kallemeyn remarked that plaintiff's reported history of

3  arrests and dependence on former abusive partners suggested the

4  possibility of a personality disorder with dependent and antisocial

5  features.    Id.    She recommended addressing plaintiff's substance

6  abuse issues and obtaining outpatient psychiatric treatment.    Id.

7      Dr. Kallemeyn explained that as to her mental status,

8  plaintiff performed within the average range on a test of attention

9  and concentration, but had some difficulty with mental tracking

10 tasks and performed between the normal to mildly impaired range on

11 a memory screening test.    Id.    This suggested that plaintiff might

12 have mild difficulty attending to and concentrating on complex

13 instructions and procedures in a potential work setting.    Id.

14 Additionally, social interactions with others would be problematic

15 for plaintiff given her reported paranoid ideation.    Id.    Finally,

16 Dr. Kallemeyn assessed plaintiff's current Global Assessment of

17 Functioning (GAF) score as 50.    Id.

18     On October 29, 2004, DDS non-examining physician Dr. Sharon

19 Eder, M.D, reviewed and affirmed the October 16, 2003 physical

20 residual capacity assessment originally rendered by Dr. Alley.    Tr.

21 379.    Also on October 29, 2004, DDS non-examining psychologist Bill

22 Hennings, Ph.D., completed a psychiatric review technique form and

23 a mental residual functional capacity assessment.    Tr. 381-98.

24     Dr. Hennings noted that plaintiff had diagnoses of psychotic

25 disorder NOS, depressive disorder NOS, a personality disorder NOS

26 with dependent and antisocial features, and methamphetamine and

27 opiod dependence in remission, per plaintiff's report.    Tr. 381-89.

28 He assessed her as having mild restrictions of daily living, and

12 - FINDINGS & RECOMMENDATION

moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace.  Tr. 391.  He further assessed her as having moderate limitations in the ability to understand and remember detailed instructions, moderate limitations in the ability to carry out detailed instructions, and moderate limitations in the ability to interact appropriately with the general public.  Tr. 395-96.

On April 10, 2005, plaintiff went to the Emergency Department at Salem Hospital because she was weeping, upset, and needed "to be detoxed."  Tr. 561.  She had recently used methamphetamine and said she wanted to stop.  Id.  She felt hopeless and tearful, and was brought to the emergency room by her children.  Id.  The report states that she had no major physical problems at the time.  Id.

Plaintiff was not acutely psychotic, but was emotionally labile.  Id.  She was defensive and easily frustrated.  Id.  Her urine drug screen was positive for methamphetamine.  Id.; Tr. 562. She was intermittently agitated and was given an anti-psychotic medication.  Tr. 561.  The emergency room physician had "PCC" come meet with plaintiff.  Id.  Plaintiff was not cooperative with "PCC's" questioning.  Id.  Although they wanted to help her and get her into a program, she was not ready to have a good conversation and try to address the plans.  Id.  The "PCC screener" indicated she could sleep there that night, and they would try to get her placed in a detox center the next morning.  Id.

On July 10, 2005, plaintiff went to the Emergency Department at Santiam Memorial Hospital complaining of "ground level falls" and fainting.  Tr. 414.  Plaintiff complained of a couple of fainting episodes she experienced on that date, and reported having

13 - FINDINGS & RECOMMENDATION

1   seizures at home.   Id.   She complained of hurting all over,
2   headache, neck pain, back pain, and pain in both legs.   Id.

3   Plaintiff reported last using methamphetamine 24 hours before
4   her appearance at the emergency room.   Id.   Dr. Stringham noted
5   that she both smoked and injected the drug.   Id.   She requested
6   help getting off of methamphetamine and feared that her ex-
7   boyfriend would force her to use it.   Id.

8   Plaintiff's urine drug screen was positive for
9   methamphetamine.   Tr. 413.   Dr. Stringham consulted with the
10  infectious disease department of Providence Medical Center because
11  they had treated her 2003 hospital admission for the staph blood
12  infection.   Tr. 413-14.

13  Dr. Stringham noted that plaintiff wanted admission to the
14  hospital for a place a stay and to protect herself from an unsafe
15  relationship, and for withdrawal, although he noted that her
16  commitment for withdrawal was unclear.   Tr. 413. He offered her a
17  referral to a safe house and explained that admission to Santiam
18  Memorial Hospital was not indicated.   Id.   She was discharged with
19  some tablets of acetaminophen with codeine and no other
20  medications, including no prescription for continued pain relief.
21  Id.   She was given the name of the appropriate contact at
22  Providence Medical Center.   Id.

23  Four days later, on July 14, 2005, plaintiff returned to the
24  Emergency Department at Salem Hospital complaining of chills and
25  fever.   Tr. 570-71.   Plaintiff was seen by Dr. Robert Kelly, M.D..
26  Tr. 570.

27  Plaintiff's temperature was normal.   Id.   Physical examination
28  of her musculoskeletal system revealed an area of pain to the right

14 - FINDINGS & RECOMMENDATION

of the parasacral area near the sacroiliac joint, but no swelling, redness, heat, or any other symptom suggestive of significant abscess or cellulitis.  Id.  Plaintiff had subjective tenderness in that area.  Id.

X-rays of plaintiff's lumbar spine, sacrum, and coccyx showed degenerative disk disease at L3-L4, degenerative joint disease of both sacroiliac joints, and degenerative changes of the pubic symphysis.  Tr. 577-78.  An MRI of her pelvis revealed no evidence of osteomyelitis in the pelvis or the region of the sacroiliac joints, and no evidence of an abscess.  Id. at 579.

Dr. Kelly reported that the clinical examination revealed only subjective finding of pain in the right parasacral sacroiliac joint area with no findings suggesting acute osteomyelitis.  Tr. 570. Plaintiff's urine drug screen was positive for methamphetamine. Tr. 571, 573.  Dr. Kelly's diagnoses were acute right parasacral pain and methamphetamine use.  Tr. 571.  While in the emergency room, plaintiff received a narcotic pain reliever, an anti-anxiety medication, and a non-steroidal anti-inflammatory medication.  Tr. 570.  She was discharged with ibuprofen.  Id.

On August 2, 2005, plaintiff returned again to Salem Hospital Emergency Department complaining of back pain, abdominal pain, and abdominal distention.  Tr. 585-86.

Plaintiff was agitated and alternated between normal conversation and crying.  Id.  She was unable to stay still on the bed.  Id.  Physical examination of her back revealed tenderness diffusely over the paraspinous muscles.  Id.  Range-of-motion was markedly decreased secondary to pain.  Id.  Another set of lumbar spine x-rays was obtained on this date, and showed no change in

15 - FINDINGS & RECOMMENDATION

appearance since the July 14, 2005.  Tr. 597.  Thus, plaintiff continued to have degenerative change at the L3-L4 disc space, and prominent bilateral sacroiliac joint degenerative change.  <u>Id.</u>  A pelvic x-ray obtained on August 2, 2005 showed prominent degenerative change at both sacroiliac joints as well as degenerative changes at the symphysis pubis.  Tr. 596.

Plaintiff's August 2, 2005 urine drug screen was negative. Tr. 594.  Plaintiff received a non-steroidal anti-inflammatory medication in the emergency room.  Tr. 586.  The emergency room physician, Dr. Gretchen Hittle, M.D., assessed plaintiff as having chronic back and abdominal pain.  <u>Id.</u>  Dr. Hittle offered plaintiff prescriptions for anti-inflammatory pain relievers, muscle relaxers, and amitriptyline.  <u>Id.</u>  Plaintiff declined them all, stating that she just needed some OxyContin and oxycodone.  <u>Id.</u> Dr. Hittle was unwilling to prescribe those medications for her. <u>Id.</u>

Dr. Hittle recommended that plaintiff use ice, heat, and stretches to help with her back.  <u>Id.</u>  Dr. Hittle further discussed rebound pain, withdrawal phenomenon, and difficulties with addiction.  <u>Id.</u>  She advised plaintiff to find a new primary care physician to help her with her chronic pain.  <u>Id.</u>

Two days later, on August 4, 2005, plaintiff returned to Santiam Memorial Hospital's Emergency Department.  Tr. 411, 415. She also returned there on August 6, 2005, August 8, 2005, August 10, 2005, and August 12, 2005.  Tr. 407-10, 412.

On August 4, 2005, she complained of abdominal fullness, pressure, and mild nausea.  Tr. 411.  An ultrasound of the abdomen and pelvis revealed a mass, approximately 4.5 centimeters in size.

16 - FINDINGS & RECOMMENDATION

Tr. 415.  The mass was of uncertain etiology, but the possibility
of pelvic inflammatory disease was entertained, as was an ovarian
cyst.  Id.  Plaintiff was given antibiotics and approximately three
days' worth of a narcotic pain reliever, and was then discharged.
Id.

On August 6, 2005, she returned with a complaint of continued
abdominal pain and the onset of vaginal bleeding.  Tr. 410.  She
had exhausted her supply of the narcotic pain reliever she received
two days earlier, but was still taking the antibiotic.  Id.  She
stated that if she were not hospitalized, she would commit suicide.
Tr. 410.  Plaintiff was extremely distraught, very paranoid, and
extremely emotionally labile.  Id.  Her drug screen was positive
for opiates and methamphetamine.  Id.  The records are unclear if
the opiates noted in the drug screen were as a result of prescribed
or illegal drugs.

Plaintiff spent seven hours in the emergency room, requesting
analgesic coverage only once.  Tr. 412.  She rested during the
majority of the time, with minimal discomfort, and complaints of
back pain due to a change in position.  Id.  She received a
psychiatric evaluation and it was determined that she was not a
significant risk to herself at the time.  Id.

It was determined that plaintiff should have a repeat
abdominal ultrasound on August 8, 2006.  She received a renewed
prescription for a narcotic pain reliever and was transported to
"Respite" because she had nowhere else to go.  Id.

On August 8, 2006, the pelvic ultrasound revealed an ovarian
cyst which was initially treated with analgesic control.  Tr. 409.
The emergency room physician, Dr. Robert Jacques, M.D., discussed

17 - FINDINGS & RECOMMENDATION

further treatment of the cyst with gynecologist Dr. Beth Vermont, M.D., who recommended conservative treatment with Yasmin, a drug typically used as a birth control pill.  Id.

On August 10, 2005, plaintiff returned again to the Santiam Memorial Hospital Emergency Department, complaining of low back pain.  Tr. 408.  The physical exam revealed subjective pain throughout her lower lumbar area, with no sacroiliac or sciatic notch pain.  Id. Her straight leg raise was subjectively positive, but not objectively.  Id.  She was discharged from the emergency department after having received one dose of a narcotic pain reliever, a muscle relaxant, ibuprofen, and an anti-anxiety medication.  Id.  Her diagnoses upon discharge were abdominal and low back pain, improving right ovarian cyst, mechanical low back pain, and history of drug abuse.  Id.

Plaintiff returned to the Santiam Memorial Hospital Emergency Department on August 12, 2005.  Tr. 407.  She complained of low back pain and increasing abdominal discomfort.  Id.  The physical examination revealed tenderness of the lumbosacral region which was aggravated with straight leg elevation of the left leg while sitting.  Id.  No neurologic deficits were perceived.  Id. Plaintiff received fifteen Vicodin.  Id.

Plaintiff was admitted to Oregon Health & Sciences University (OHSU) on August 17, 2005, and remained there until August 23, 2005, after an MRI confirmed a diagnosis of L4-L5 diskitis and osteomyelitis with Escherichia coli.  Tr. 453.  The MRI also showed severe canal and bilateral foraminal stenosis secondary to inflamed tissue.  Tr. 468.  She received IV antibiotics while in the hospital.  Tr. 453.  The discharge summary noted that chronic pain

18 - FINDINGS & RECOMMENDATION

1  was a significant problem for plaintiff during her hospitalization
2  and she required large doses of IV narcotics with requests to
3  titrate up the doses daily.  Tr. 454.

4      Before being discharged, plaintiff received a PICC line though
5  which she was to continue to receive IV antibiotics.  Tr. 453-54.
6  Plaintiff was discharged to a bed managed by Central City Concern
7  with Providence Home Health managing the IV antibiotics treatment.
8  Tr.  454.   At  discharge,  her  medications  included  the  IV
9  antibiotics,  long acting morphine, oxycodone, an anti-psychotic
10 medication, and an anti-depressant medication.  Tr. 454.  It was
11 noted that she had no primary care provider and would need to find
12 one to manage her chronic pain as well as to follow up on the
13 osteomyelitis diskitis.  Tr. 454.

14     A record identified as being from Dr. Gary Olbrich, M.D.[6],
15 dated August 23, 2005, notes that plaintiff was discharged from
16 OHSU and was entering the "Respit care program."  Tr. 633.  The
17 summary of this visit indicates that plaintiff was treated at OHSU
18 for osteomyelitis of the spine, specifically in the vertebral area
19 of L4 to L5, and that this was secondary to bacteremia.  Tr. 633-
20 34.  Plaintiff was to start receiving six weeks of IV antibiotics
21 through Providence Home Health.  Id.  She also was given morphine
22 and oxycodone, although she was advised to decrease her use of
23 oxycodone.  Tr. 633-34.  She also was continued on anti-depressant

24

25     [6]  The index to exhibits identifies pages 629 to 634 of the
26 Administrative Record, as being records from Dr. Olbrich.  Tr. 4.
   Although most of those pages indicate that plaintiff saw Dr.
27 Olbrich, the August 23, 2005 record indicates that on that date,
   plaintiff saw Dr. Olbrich's Physician's Assistant Barbara Martin.
28

19 - FINDINGS & RECOMMENDATION

1  and anti-psychotic medications.  Tr. 634.  Plaintiff received the
2  IV antibiotics until approximately October 7, 2005.  Tr. 427.

3       The  next  medical  record  is  of  a  visit  to  Dr.  Olbrich
4  approximately six months later, on April 18, 2006.  Tr. 631.  Dr.
5  Olbrich provided detailed notes about plaintiff's exaggerated pain
6  behavior.   He  described  that  when  he  walked  into  the  room,
7  plaintiff looked fine and then she developed a frown and suddenly
8  was not doing well.  Id.  She described having pain, seething down
9  into her right hip and right lateral thigh, causing her to thrash
10 at night, lose sleep, and further causing her to limp.  Id. As Dr.
11 Olbrich noted, plaintiff "then proceeded to demonstrate for me a
12 significantly[,] in my opinion[,] exaggerated limp."  Id.  Physical
13 examination of her back revealed no evidence of paraspinous muscle
14 spasm, and there was no tenderness to very firm pressure in the
15 area she said was tender.  Id.

16      Dr.  Olbrich  confronted  plaintiff  about  her  escalating
17 complaints and explained that he would write her narcotic pain
18 prescriptions only on a monthly basis and would prescribe only
19 enough for her for that time period.  Id.  He described plaintiff
20 as being "not at all happy."  Id.  Dr. Olbrich assessed plaintiff
21 as being status post osteomyelitis with chronic pain, and having
22 opiate  dependence  in  partial  remission.   Id.   He  renewed  her
23 prescription for one month of methadone, but dated it for the
24 following week because that is when it should have been refilled if
25 she had not taken extra.  Id. He also wrote her a prescription for
26 amitriptyline, an anti-depressant.  Id.

27      Dr. Olbrich next saw plaintiff on May 23, 2006.  Tr. 630.  She
28 complained of excruciating pain.  Tr. 630.  Dr. Olbrich stated that

20 - FINDINGS & RECOMMENDATION

the current methadone dosage was not stabilizing plaintiff. Although he felt that she was a "little bit dramatic" when she talked about the problem, he also felt that the adequate dosage for plaintiff had not been reached. Id. He assessed her as having chronic pain secondary to degenerative disk disease due to osteomyelitis. Id. He increased her methadone dose to twenty milligrams, four times per day (for a total of eighty milligrams per day), which was up from ten milligrams, five times per day (for a total of fifty milligrams per day).

The last record from Dr. Olbrich is dated June 23, 2006, when plaintiff sought treatment for a urinary tract infection. Tr. 629. In the subjective portion of his chart note, Dr. Olbrich noted that plaintiff was stable on her current dosage of medication for her chronic pain secondary to the osteomyelitis and just needed a refill for the methadone. Id. She was given a prescription for antibiotics for the infection. Id.

In May 2006, plaintiff's counsel sent a mental impairment questionnaire to psychiatric mental health nurse practitioner Elizabeth Cooper at the Portland Alternative Health Center. Tr. 399. Cooper completed the questionnaire and signed it on May 31, 2006, between plaintiff's last two visits to Dr. Olbrich. Tr. 406. On the first page, Cooper indicates that she had seen plaintiff three times, for thirty minutes, since January 2006 for "mental health." Tr. 399. No clinic or treatment records of these visits are in the Administrative Record.

In response to an open-ended question seeking information about "[o]ther symptoms and remarks[,]" Cooper wrote that plaintiff's opiate dependence "clouds any symptoms of a mental

21 - FINDINGS & RECOMMENDATION

illness that could be treated." Tr. 401.  In response to the next question asking about the clinical findings, including results of mental status examination, which demonstrate the severity of the patient's mental impairment and symptoms, Cooper wrote that it was "difficult to assess given above," which, presumably, was a reference to the opiate dependence.  Id.

Cooper checked "no" in response to the question of whether the patient's impairments were reasonably consistent with the symptoms and functional limitations described in the evaluation.  Id.  As an explanation for her "no" response, Cooper stated that the use of opiates made a definitive diagnosis and treatment difficult.  Id.  She noted that plaintiff was inconsistent in keeping her appointments and in taking her medications.  Id.

Cooper was unable to provide answers to several questions directed at ascertaining plaintiff's ability to work, including questions such as whether it was reasonable to expect that plaintiff would experience substantial difficulty with stamina, pain, or fatigue if working full time, eight hours a day, at a light or sedentary level.  Tr. 402.  In response to these types of questions, Cooper simply wrote a question mark instead of checking the "yes" or "no" boxes provided.  Id.

In another section seeking information on the mental abilities and aptitudes needed to perform unskilled work, such as the ability to understand and remember short and simple instructions, Cooper failed to provide any rating for plaintiff on any of the sixteen abilities or aptitudes.  Tr. 404.  Instead, she wrote at the bottom that it "would depend on use of prescribed or illegal opiate use." Id.

22 - FINDINGS & RECOMMENDATION

1    Next, there was a section seeking Cooper's assessment of four
2    functional limitations based on plaintiff's mental impairments:
3    (1) restrictions of activities of daily living, (2) difficulties in
4    maintaining social function, (3) deficiencies of concentration,
5    persistence or pace resulting in the failure to complete tasks in
6    a   timely   manner,   and   (4)   episodes   of   deterioration   of
7    decompensation.  Tr. 405.  Again, Cooper opted not to provide the
8    requested assessment, but just hand wrote "not due to mental
9    impairments."  Id.

10    In response to a question asking if the patient could manage
11    benefits in his or her own best interest, Cooper wrote a question
12    mark.  Id.  In response to the question asking the approximate date
13    from which the patient has continuously been unable to work, Cooper
14    wrote that she did not have the full history.  Id.

15    One of the questions asked that, assuming drug or alcohol
16    abuse was present, was the patient self-medicating an underlying
17    mental or emotional problem.  Tr. 406.  Cooper did not check the
18    "yes" or "no" boxes provided, but wrote the following in response:
19    "it is an addiction disorder."  Id.  The next question asked if
20    drug or alcohol abuse was present, was it the primary, dominant
21    cause of the patient's disability?  Id.  To this, Cooper responded
22    that it was "[d]ifficult to assess."  Id.  A follow up question
23    inquired if there was "a situation where years of past drug or
24    alcohol abuse have resulted in ongoing health problems that will
25    now exist even though drug or alcohol abuse may have reduced or
26    abated?"  Id.  Cooper answered "yes."  Id.

27    Cooper indicated that plaintiff's prognosis was poor if
28    plaintiff continued to use opiates.  Tr. 402.  Finally, she rated

23 - FINDINGS & RECOMMENDATION

plaintiff's current GAF as 59, with a high GAF of 58 in the past year, and a low of 55 in the past year.[7]  Tr. 399.

On July 1, 2006, plaintiff went to the Providence Portland Medical Center Emergency Department complaining of back pain.  Tr. 441, 451.  She complained of having pain for the previous three weeks, radiating down her leg, as well as intermittent fever, sore throat, and generalized achiness.  Tr. 441.  Plaintiff also complained of lower left abdominal pain.  Id.

On physical examination, there was non-focal pain in the back of the lumbar areas, involving both the midline as well as bilateral muscles.  Tr. 442.  This also extended to the thoracolumbar area as well.  Plaintiff received spinal x-rays and a CT scan.  These studies showed prominent sclerosis and a partial spinal fusion at L4-L5, but no obvious abscess or mass.  Id.; Tr. 431-33.  Although there were "areas of lucency at about L4-5 disk space of questionable significance," the physician noted that plaintiff appeared improved and it was thought that she had a viral syndrome with fever.  Id.  No evidence of recurrent osteomyelitis was found.  Id.

Plaintiff received morphine while in the emergency department with good effect.  Id.  She was discharged in good condition and told to call the "PACE Clinic," for follow up and to arrange for an MRI.  Tr. 442, 451.  She was given a prescription for fifteen oxycodone, to be taken every four hours as needed for pain.  Tr.

---

[7]  It seems inconsistent for Cooper to have assessed plaintiff's high GAF of the past year as 58, but also state that her current GAF was 59.  To me, the current assessment is the end of the "past year."

24 - FINDINGS & RECOMMENDATION

451.

There are no additional medical records in the Administrative Record.

II.  Plaintiff's Testimony

Plaintiff testified at the September 19, 2006 hearing.  Tr. 637-76.  Plaintiff stated that she had seven years of education, had never obtained a GED, and had had very little training or education since seventh grade.  Tr. 639.  She described that she last worked in 1998, for one month doing millwork, but she left the job because she could not do the required lifting or bending.  Tr. 640.  She also indicated that she helped a friend with housekeeping or babysitting in exchange for a place to stay, in about 2001.  Tr. 641.  There was one child, an infant, who weighed about ten pounds, and plaintiff did this for three or four weeks.  Tr. 642.

About this same time, she worked in a motel for a couple of hours per day cleaning rooms, but she quit after about one week because she had difficulty bending and the job was too hard for her.  Tr. 641-42.

Plaintiff testified that at the time of the hearing, she was emotionally, mentally, and physically unable to work.  Tr. 645. She said this began in 1996 when she was hospitalized for osteomyelitis which made in difficult for her to continue any kind of job.  Id.  She identified her back, spine, and hips, and her emotional state of mind as the main problems preventing her from working.  Tr. 645-46.

She described experiencing pain every day in her spine, hips, and knees.  Tr. 646.  On a scale of zero to ten, with ten being the worst, she rated her pain on an average day as seven to eight.  Id.

25 - FINDINGS & RECOMMENDATION

1  She indicated that one and one-half years before the hearing, she
2  started taking methadone for her chronic pain.  Tr. 647.  She also
3  was currently taking Zyprexa, an anti-psychotic drug for her
4  "emotional state."  Tr. 647.  With the methadone, her pain is about
5  a three on the one to ten scale.  Id.  Methadone makes her drowsy.
6  Id.  She still experiences pain if she moves around.  Id.

7       Plaintiff testified that since December 2001, she has been
8  able to lift only five pounds occasionally, has been able to stand
9  only ten to fifteen minutes at a time, has been able to stand only
10  a total of thirty minutes out of an eight-hour day, has been able
11  to sit no more than ten or fifteen minutes at a time, has been able
12  to sit a total of twenty-five minutes in an eight-hour day, and has
13  been able to walk two blocks.  Tr. 649-50.

14       Plaintiff stated that she was able to sleep five to six hours
15  per night, and since she got out of the hospital, "[t]he first
16  time," presumably meaning 1996, she has spent most of each day,
17  "like 12 hours," lying down.  Tr. 658.  Plaintiff explained that
18  she is unable to get along with other people because she has a fear
19  of people.  Id.

20       Plaintiff does not get herself dressed three to four times per
21  week and said she had not done household chores since December
22  2001.  Tr. 663.  Her boyfriend does the cooking, dishwashing, and
23  shopping.  Id.  Plaintiff has not done any vacuuming since December
24  2001.  Id.  She does not take walks.  Id.  She does not see
25  friends.  Id.  She has spent no time on hobbies.  Id.  She does not
26  do laundry.  Id.

27       In regard to her history of illegal drug use, plaintiff said
28  she had used illegal drugs "[s]ince ever."  Tr. 659.  She was

26 - FINDINGS & RECOMMENDATION

1    addicted to heroin in the 1990s, and then stopped, but then

2    starting using methamphetamines.  Id.  She stated that she had used

3    methamphetamines only two or three times since December 2001, and

4    denied being addicted to them because her last use had been

5    sometime in 2004.  Id.

6        At the time of the hearing, plaintiff said she tried to see

7    Cooper once per month, but she had not been able to see her for a

8    few months.  Tr. 657.  Plaintiff explained that plaintiff moved,

9    and that Cooper had missed two appointments.  Id.  Cooper was

10   prescribing Zyprexa for plaintiff, an anti-psychotic medication.

11   Id.

12   III.  Vocational Expert Testimony

13       Vocational Expert (VE) Paul Morrison testified at the hearing.

14   The ALJ posed an initial hypothetical as follows:  a person of

15   plaintiff's age, education, and past relevant work experience who

16   can lift twenty pounds occasionally and ten pounds frequently, can

17   stand and walk at least two of eight hours, and sit about six of

18   eight hours.  Tr. 671.  In response, the VE identified the

19   following jobs that exist in significant numbers in the United

20   States that such a person could perform:  (1) parking lot cashier,

21   and (2) blood donor unit assistant.  Id.  According to the VE, both

22   are classified as light work, unskilled, with a specific vocational

23   preparation level (SVP) of 2.  Id.

24       The ALJ then added to the hypothetical a limitation of an

25   ability to perform only simple tasks not involving extensive social

26   interaction.  Id.  In response, the VE testified that the person

27   would be unable to perform either of the two jobs he had

28   identified.  Id.

27 - FINDINGS & RECOMMENDATION

1    The VE explained, however, that even with the added
2 limitation, the hypothetical person could still perform the jobs of
3 laundry folder and general laundry worker. Tr. 672. Both of those
4 jobs he identified as being light work, unskilled, with a SVP of 2.
5 Id. Additionally, he opined that the person could perform the job
6 of small products assembly, also classified as light work,
7 unskilled, with a SVP of 2. Id.

8    The ALJ then changed the hypothetical so the person could deal
9 with simple tasks and understand detailed ones, but would be
10 limited in sustaining concentration on multi-step tasks, could
11 interact with the public to a limited extent, and should avoid
12 concentrated exposure to hazards. Id. The VE responded that this
13 person could still perform the jobs in the area of laundry work,
14 the parking lot cashier job, and the small products assembly job.
15 Tr. 673.

16    If the person also needed the option to sit/stand, the VE
17 testified that the person could still do the laundry jobs, the
18 parking lot cashier job, and the blood donor job, but could not do
19 the small products assembly job. Id. Finally, if the person could
20 lift only ten pounds occasionally, but not twenty, the person could
21 still do "all four" of the identified jobs, even with the sit/stand
22 option. Id.[8]

23

24    [8] The VE's testimony appears somewhat inconsistent here.
25 In this version of the hypothetical presented by the ALJ, the ALJ
imposed an additional restriction on the ability to lift
26 occasionally, making it ten pounds instead of twenty. The VE,
who previously said that the individual could not perform the job
27 of small products assembly with the sit/stand restriction, stated
that the person could perform "all four" of the identified jobs,
28 which appears to include the small products assembler job she

1   In response to questioning by plaintiff's counsel, the VE
2   testified that if a person was to miss two or more days of work per
3   month, the person would be unable to sustain employment.  Tr. 674.

4                         THE ALJ'S DECISION

5   The ALJ first determined that plaintiff had not engaged in
6   substantial gainful activity since the alleged onset date of
7   December 6, 2001.  Tr. 18.  The ALJ found that plaintiff's severe
8   impairments included lumbar osteomyelitis and diskitis, depression,
9   and polysubstance abuse, but that the impairments did not meet or
10  equal, either singly or in combination, a listed impairment.  Tr.
11  19.

12  Considering all of plaintiff's severe impairments and her
13  substance abuse disorder, the ALJ found the following mental
14  limitations:  (1) mild restrictions in her activities of daily
15  living, (2) moderate difficulties in maintaining functioning, (3)
16  and moderate difficulties in maintaining concentration, persistence
17  and pace.  Tr. 20.  Additionally, the ALJ found that plaintiff
18  would be unable to perform sustained work on a regular and
19  continuing basis for an eight-hour workday.  Id.

20  The ALJ then discussed plaintiff's substance abuse and
21  concluded that her drug addiction is a material factor that
22  contributes to her disability.  Tr. 21.  He found that if she
23  stopped using drugs, the remaining limitations would not be

24

25  just stated was not an option for the hypothetical individual.
26  Because of my resolution of the case, I do not address
    plaintiff's argument that errors were made at step five of the
27  sequential analysis, but I note that defendant himself admits
    that the question and answer exchange between the VE and the ALJ
28  was "less than clear."  Deft's Brief at p. 9.

29 - FINDINGS & RECOMMENDATION

1  disabling and she would experience only mild restrictions in her

2  activities of daily living, moderate difficulties in maintaining

3  social   functioning,   and   mild   difficulties   in   maintaining

4  concentration, persistence, and pace.  Id.  Additionally, she would

5  be able to perform sustained work on a regular and continuing basis

6  for a normal eight-hour workday.  Id.

7      The ALJ concluded that plaintiff had the residual functional

8  capacity (RFC) to lift and carry twenty pounds occasionally and ten

9  pounds frequently, to sit for up to six hours in an eight-hour day,

10  and stand or walk for up to two hours in an eight-hour day.  Id.

11  She was also restricted to simple, routine, repetitive work, not

12  involving   close   interaction   with   the   public   or   concentrated

13  exposure to hazardous conditions.  Id.  With this RFC, the ALJ

14  determined that plaintiff could perform the jobs of parking lot

15  cashier, blood donor unit assistant, and small products assembler.

16  Tr. 27.  Thus, the ALJ determined that plaintiff was not disabled.

17  Id.

18              STANDARD OF REVIEW & SEQUENTIAL EVALUATION

19      A claimant is disabled if unable to "engage in any substantial

20  gainful activity by reason of any medically determinable physical

21  or mental impairment which . . . has lasted or can be expected to

22  last for a continuous period of not less than 12 months[.]"    42

23  U.S.C. § 423(d)(1)(A).   Disability claims are evaluated according

24  to a five-step procedure.  Baxter v. Sullivan, 923 F.2d 1391, 1395

25  (9th  Cir.  1991).   The  claimant  bears  the  burden  of  proving

26  disability.   Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir.

27  1989).  First, the Commissioner determines whether a claimant is

28  engaged in "substantial gainful activity."  If so, the claimant is

30 - FINDINGS & RECOMMENDATION

not disabled.   Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b).  In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." Yuckert, 482 U.S. at 140-41; see 20 C.F.R. §§ 404.1520(c), 416.920(c).  If not, the claimant is not disabled.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 141; see 20 C.F.R. §§ 404.1520(d), 416.920(d).  If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four.  Yuckert, 482 U.S. at 141.

In step four the Commissioner determines whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant can, he is not disabled.  If he cannot perform past relevant work, the burden shifts to the Commissioner.  In step five, the Commissioner must establish that the claimant can perform other work.  Yuckert, 482 U.S. at 141-42; see 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f).  If the Commissioner meets its burden and proves that the claimant is able to perform other work which exists in the national economy, he is not disabled.  20 C.F.R. §§ 404.1566, 416.966.

The court may set aside the Commissioner's denial of benefits only when the Commissioner's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Baxter, 923 F.2d at 1394.  Substantial evidence means "more than a mere scintilla," but "less than a preponderance."  Id.  It means

31 - FINDINGS & RECOMMENDATION

1  such relevant evidence as a reasonable mind might accept as
2  adequate to support a conclusion.  Id.

3                          DISCUSSION

4      Plaintiff contends that the ALJ made several errors.  First,
5  she contends that the ALJ failed to properly assess her substance
6  abuse.  Second, she asserts that the ALJ made errors, including
7  ignoring the mandatory requirements of Social Security Ruling (SSR)
8  96-8P, when determining her RFC.  Third, she contends that the ALJ
9  presented a defective hypothetical to the VE, and committed several
10 other errors at step five of the sequential evaluation.

11     Because I find the first argument dispositive, I decline to
12 address the remaining arguments.

13     The evidence in the record clearly demonstrates that plaintiff
14 has had, at one time or another, addiction problems with various
15 substances including heroin, methamphetamines, and opiates.  Under
16 the Social Security Act, an "individual shall not be considered to
17 be disabled for purposes of [social security disability or
18 supplemental security income benefits] if alcoholism or drug
19 addiction would (but for this subparagraph) be a contributing
20 factor material to the Commissioner's determination that the
21 individual is disabled."    42 U.S.C. §§ 423(d)(2)(C),
22 1382c(a)(3)(J).  If the Commissioner "find[s] that [a claimant is]
23 disabled and [the Commissioner] [has] medical evidence of [the
24 claimant's] drug addiction or alcoholism, [the Commissioner] must
25 determine whether [the claimant's] drug addiction or alcoholism is
26 a contributing factor material to the determination of disability."
27 20 C.F.R. §§ 404.1535(a), 416.935(a).

28     The proper analysis by the ALJ in a case where the claimant
32 - FINDINGS & RECOMMENDATION

has alcohol or drug addiction issues, is to first conduct the five-step sequential evaluation "without separating out the impact of alcoholism or drug addiction." Bustamante v. Massanari, 262 F.3d 949, 955 (9th Cir. 2001). If the ALJ determines that the claimant is not disabled, the claimant is not entitled to benefits and no further analysis is necessary. Id. If, considering the impact of the relevant addiction, the ALJ determines that the claimant is disabled, then the ALJ should proceed under section 404.1535 or 416.935, to determine if the claimant "would still be found disabled if he or she stopped using alcohol or drugs." Id. (internal quotation and brackets omitted).

Under this drug and alcohol abuse (DAA) analysis, the ALJ determines "which of the claimant's disabling limitations would remain if the claimant stopped using drugs or alcohol." Parra v. Astrue, 481 F.3d 742, 747 (9th Cir. 2007), cert. denied, 128 U.S. 1068 (2008). "If the remaining limitations would still be disabling, then the claimant's drug addiction or alcoholism is not a contributing factor material to his disability. If the remaining limitations would not be disabling, then the claimant's substance abuse is material and benefits must be denied." Id.

The ALJ in this case concluded that "after considering the clinical facts, medical findings and opinions of the treating and examining physicians, as well as other evidence of record, the undersigned finds the claimant would be unable to perform sustained work on a regular and continuing basis for a normal eight-hour workday." Tr. 20. In support, the ALJ cited to psychiatric nurse practitioner's Cooper's May 2006 statement that plaintiff would likely be absent from work more than four times per month because

33 - FINDINGS & RECOMMENDATION

1    of her opiate use.  Id.

2        With this finding, the ALJ was then obligated to engage in the

3    appropriate DAA analysis.  The ALJ explained that Cooper stated

4            that claimant's functional capacity would depend on use
             of prescribed and illegal opiates and that functional
5            limitations were "not due to mental impairments."  She
             referred to the claimant as having an "addiction
6            disorder" and said her prognosis is "poor if continues to
             use opiates." . . . Thus, the gist of Ms. Cooper's report
7            is that claimant is mainly limited by her use of drugs.
             In spite of that, Ms. Cooper indicated it was difficult
8            to assess whether drug or alcohol abuse was the primary
             cause of the claimant's disability; she indicated that
9            years of past drug abuse had resulted in ongoing health
             problems that would exist even if such abuse was reduced
10           or stopped. . . . These conflicting statements muddy Ms.
             Cooper's report but she referred to no findings that
11           support a conclusion that a diagnosis other than drug
             addiction is involved in the claimant's functional
12           limitations.  Thus, her words support the conclusion that
             drug addiction is a material factor that contributes to
13           disability.

14   Tr. 20-21.

15       The ALJ then cited to three other records the ALJ determined

16   supported the ALJ's conclusion that "drug addiction is the

17   claimant's main problem."  Tr. 21.  First, the ALJ noted that in

18   April 2006, Dr. Olbrich remarked on plaintiff's "exaggerated limp,"

19   and indicated that plaintiff was taking more medication than she

20   had been told to take.  Id.  Second, the ALJ cited Dr. Stringham's

21   July 17, 2003 emergency room report for the proposition that a

22   doctor had questioned plaintiff's credibility, and that there was

23   a positive methamphetamines test.  Id.

24       Third, the ALJ noted that psychologist Dr. Kallemeyn's October

25   2004 report listed plaintiff's primary diagnoses as opiod

26   dependence and methamphetamine dependence and that Dr. Kallemeyn

27   indicated that plaintiff was inconsistent in her reporting and was

28   not a reliable historian about her use of drugs.  Id.  The ALJ also

34 - FINDINGS & RECOMMENDATION

noted that Dr. Kallemeyn's statement that treatment for drug abuse was a priority in order to bring stability to plaintiff's life, was further support for the conclusion that drug abuse is material to a finding of disability.  Id.

Thus, the ALJ explained, even though Cooper "is not an acceptable source under the Social Security Administration's regulations[,]" her opinion is considered reliable because it is consistent with the record as a whole."  Id.

Plaintiff contends that the ALJ's DAA analysis is flawed for three separate reasons.  Plaintiff argues first that it was error to rely on Cooper's report because her practice is limited to mental health and she expressed no familiarity with plaintiff's other impairments which the ALJ herself found to be severe, including lumbar osteomyelitis and diskitis.  Because Cooper focused only on plaintiff's mental health and opiate consumption, her opinions do not provide substantial evidence to conclude that plaintiff could return to work if the opiate consumption ceased.

Second, plaintiff argues that Cooper's report is ambiguous because it fails to distinguish between prescribed and non-prescribed opiates.  Plaintiff notes that the record clearly establishes that she is prescribed opiates for pain due to her chronic pain problems including recurring osteomyelitis which has resulted in a degenerative fusion and degenerative joint disease in her lower back.  Cooper's report is not substantial evidence that plaintiff's drug use is material to her disability when the report fails to address the legitimate use of prescribed opiates and any consequences to plaintiff's condition if she stopped using the prescribed pain medication.

35 - FINDINGS & RECOMMENDATION

1    Third, plaintiff contends that contrary to the ALJ's
2 conclusion, other evidence in the record does not support the ALJ's
3 interpretation of Cooper's report.    Plaintiff notes that like
4 Cooper, Dr. Kallemeyn focused on plaintiff's mental impairments and
5 her report fails to show knowledge of any limitations caused by
6 plaintiff's physical impairments.    Also, plaintiff argues that her
7 past use of illegal drugs, an exaggerated limp, and taking more
8 medication than prescribed does not reasonably support a finding
9 that drug addiction is material to disability, especially when
10 there are periods without such behavior and plaintiff still
11 experiences disabling pain.

12    In response, defendant notes that Cooper was specifically
13 asked to give opinions on plaintiff's mental impairments and that
14 she was aware of plaintiff's pain and her prescription for opiate
15 pain relievers.    Defendant argues that Cooper found drug addiction
16 to be a significant issue notwithstanding the fact that plaintiff
17 was prescribed some of the substances at issue.

18    Defendant also notes that the ALJ relied on other evidence in
19 the record to support her conclusion, including the reports of
20 medical doctors Dr. Olbrich and Dr. Kallemeyn.    Finally, defendant
21 argues that an addiction to prescribed medications is still
22 governed by the DAA analysis and is within the agency's
23 regulations.

24    I agree with plaintiff that the ALJ erred in the DAA analysis.
25 Cooper's report does not support the ALJ's conclusion because it
26 fails to address any limitations (mental and/or physical) plaintiff
27 has absent inappropriate drug use.    The other evidence cited by the
28 ALJ, including Dr. Kallemeyn's report, also does not sufficiently

36 - FINDINGS & RECOMMENDATION

1  address the issue.

2      The ALJ initially relied on four statements made by Cooper.
3  The first is Cooper's statement that "claimant's functional
4  capacity would depend on use of prescribed and illegal opiates" and
5  the second is Cooper's response to the question seeking an
6  assessment of certain functional limitations (activities of daily
7  living, difficulties in maintaining social functioning,
8  deficiencies of concentration, persistence, or pace resulting in a
9  failure to complete tasks in a timely manner in work settings or
10  elsewhere, and episodes of decompensation), where she stated that
11  they were not due to mental impairments.  Tr. 20.

12      The first statement was limited to the questions seeking
13  information on plaintiff's mental abilities and aptitudes, and did
14  not relate to any physical functional limitations.  Tr. 404.
15  Cooper failed to answer any of the questions seeking information on
16  any physical limitations plaintiff may have. Tr. 399-406. And, in
17  the second statement, while Cooper states that certain delineated
18  functional limitations were not due to mental impairments, she
19  failed to give an actual assessment of those functional
20  limitations.  On the one hand, Cooper indicates that plaintiff's
21  mental abilities and aptitudes depend on her use of prescribed and
22  illegal opiates.  On the other hand, she states that certain
23  functional limitations were not due to mental impairments.  Thus,
24  Cooper says that plaintiff's abilities and aptitudes depend on
25  plaintiff's drug use, but she also says that plaintiff's functional
26  limitations are not due to plaintiff's mental impairments.
27  Although she does not expressly state that plaintiff has functional
28  limitations due to any physical impairments, her report is less

37 - FINDINGS & RECOMMENDATION

1   than clear on that issue.

2       The third statement relied on by the ALJ was Cooper's response
3   to the question asking whether, if drug abuse was present, was
4   plaintiff self-medicating an underlying mental or emotional
5   problem, where Cooper said that plaintiff had an addiction
6   disorder.  Tr. 20.  The fourth statement was that plaintiff's
7   prognosis was poor if plaintiff continued to use opiates.  Id.

8       The ALJ relied on these four statements by Cooper (that
9   plaintiff's functional capacity would depend on her use of opiates,
10  that her functional limitations were not due to mental impairments,
11  that plaintiff has an addiction disorder, and that plaintiff's
12  prognosis is poor if she continues to use opiates), to conclude
13  that the "gist" of Cooper's report is that plaintiff "is mainly
14  limited by her use of drugs."  The ALJ's use of the word "mainly,"
15  and the ALJ's implication that Cooper addressed all functional
16  limitations, are not supported by substantial evidence.

17      Cooper's report makes very clear that in regard to plaintiff's
18  mental health, plaintiff's addiction disorder was an issue.
19  Cooper's report makes no mention of any physical limitations.  The
20  statements cited by the ALJ do not reasonably support the
21  conclusion that Cooper concluded that plaintiff, overall, was
22  "mainly" limited by her drug use.

23      Additionally, Cooper failed to assess any actual limitations,
24  mental or physical, other than to opine that plaintiff would miss
25  more than four days of work per month because of her opiate use.
26  Tr. 399-406, 403.  Instead, she put question marks next to boxes
27  and simply did not respond to questions seeking assessments.  Thus,
28  Cooper's report fails to show in what manner Cooper thought

38 - FINDINGS & RECOMMENDATION

plaintiff was limited.  As a result, it is hard to say exactly what relative role or weight Cooper ascribed to plaintiff's drug use in regard to the unarticulated limitations.

As the ALJ himself recognized, Cooper expressly stated that it was difficult to assess whether drug abuse was the primary cause of plaintiff's disability, and, notably, Cooper expressly stated that plaintiff presented a "situation where years of past drug or alcohol abuse have resulted in ongoing health problems that will now exist even though drug . . . abuse may have reduced or abated[.]"  Tr. 406.  But, even though the ALJ indicated that Cooper's report was "mudd[ied] by supposed "conflicting statements," the ALJ determined that because Cooper "referred to no findings that support a conclusion that a diagnosis other than drug addiction is involved in [plaintiff's] functional limitations[,] her words support a conclusion that drug addiction is a material factor that contributes to disability."  Id.

Part of the problem here is that Cooper referred to no findings at all in her report, and as noted above, assessed no functional limitations other than missing work.  In response to the question asking for clinical findings, including the results of mental status examinations, which demonstrate the severity of plaintiff's mental impairments and symptoms, Cooper stated "difficult to assess given above," which was presumably a reference to the opiate dependence Cooper mentioned in response to the prior question.  Tr. 401.  Given the overall vagueness of Cooper's report, the complete absence of any clinical findings does not support a determination that no diagnoses other than drug addiction contribute to disability.

39 - FINDINGS & RECOMMENDATION

1    Again, it is unclear from the report what limitations, if any,
2    Cooper believed plaintiff to have.  And, most importantly, Cooper's
3    report gives no indication that she evaluated the possibility
4    plaintiff may have physical limitations caused by the very "ongoing
5    health problems" Cooper acknowledges plaintiff has in the absence
6    of continued drug abuse.  Cooper saw plaintiff only three times,
7    for thirty minutes each time, between January and May 2006.  Tr.
8    406.  She is a psychiatric nurse practitioner, identified in the
9    regulations as an "other source," 20 C.F.R. § 404.1513(d)(1), not
10   an "acceptable medical source," 20 C.F.R. § 404.1513(a), and she
11   saw plaintiff for mental health problems.  Tr. 399.  She did not
12   treat plaintiff's physical problems and does not seem to claim she
13   has the expertise to opine on them.

14   Although plaintiff was taking methadone as prescribed by Dr.
15   Olbrich at the time she saw Cooper, Cooper did not list this
16   medication in the "list of prescribed medications" section of her
17   report.  Tr. 401.  There is no indication in Cooper's report that
18   she considered the effects of the legitimate use of methadone that
19   plaintiff was currently taking as prescribed by her treating
20   physician.  Moreover, other than Cooper's reference to plaintiff's
21   illegal opiate use, there is no other evidence in the record to
22   support the illegal use of opiates by plaintiff at that time.
23   While there is clearly evidence of drug-seeking behavior, overuse,
24   and abuse, the opiates plaintiff used appear to have been
25   prescribed to her by treating physicians.

26   Because it is limited to plaintiff's mental health and fails
27   to consider all of her ongoing physical and mental health issues,
28   Cooper's report cannot be substantial evidence in support of a

40 - FINDINGS & RECOMMENDATION

conclusion about the relative materiality of drug use in regard to plaintiff's overall functional limitations.  There is no denying that plaintiff has a long history of drug abuse, including heroin in the 1990s and methamphetamines during some apparently extended periods in the 2000s, including after her alleged onset date.  It may be that her drug abuse has been, or is, a material factor contributing to her disability.  But, Cooper's report is not sufficient to support such a determination.

Additionally, in the face of such an ambiguous report by Cooper, the other evidence cited by the ALJ does not cure the ambiguity and thus does not support the ALJ's materiality determination.  First, the fact that a doctor in July 2003 questioned plaintiff's credibility does not provide evidence one way or the other, regarding the relative role that plaintiff's drug addiction plays in her overall functional limitations.  Similarly, that same physician's notation of a positive test for methamphetamines simply confirms that plaintiff has abused drugs. It does not speak to the materiality of the drug abuse.

Second, Dr. Kallemeyn's statements regarding plaintiff's drug use also do not provide sufficient additional evidence to support the ALJ's conclusion.  Like Cooper, Dr. Kallemeyn assessed plaintiff's mental health and did not assess plaintiff's physical limitations. Dr. Kallemeyn's report discusses plaintiff's drug use and the need for her to obtain treatment, but Dr. Kallemeyn herself stated that functional impairments related to the osteomyelitis needed to be medically evaluated.  Tr. 370.  Thus, her report supports a conclusion that plaintiff has abused drugs, that plaintiff is an unreliable historian, and that plaintiff needed

41 - FINDINGS & RECOMMENDATION

1   drug treatment.  It does not go so far as to conclude that drug use

2   is a material factor contributing to plaintiff's disability.

3       Third, Dr. Olbrich's April 18, 2006 statements that plaintiff

4   presented an exaggerated limp and took more medication than she had

5   been told to take, while relevant, do not answer the question of

6   whether plaintiff's disability would remain absent drug addiction.

7   Like other evidence in the Administrative Record, Dr. Olbrich's

8   records expose drug-seeking behavior and overuse.  But, the very

9   same record from that date shows that his diagnoses of plaintiff's

10  impairments were osteomyelitis with chronic pain and opiate

11  dependence in partial remission.  Tr. 631.  Notably, he also

12  renewed plaintiff's methadone prescription for another month, and

13  added a prescription for an anti-depressant.  Id.  Furthermore, the

14  very next month, Dr. Olbrich noted that the appropriate dosage of

15  methadone needed to relieve plaintiff's pain had not yet been

16  reached.  Id.  Dr. Oblrich then increased plaintiff's dose of

17  methadone and at the next visit in June 2006, he reported that she

18  was stable on her current dose of methadone.  Tr. 629.  While Dr.

19  Olbrich's April 18, 2006 chart note shows plaintiff exaggerating

20  her symptoms in an unsuccessful attempt to obtain additional

21  medication, it does not provide support for the ALJ's conclusion

22  that plaintiff's drug abuse is material to her disability.

23      In summary, some parts of the medical evidence from Dr.

24  Kallemeyn and Dr. Olbrich are supportive of what Cooper may have

25  been alluding to.  But, none of the evidence from Dr. Olbrich and

26  Dr. Kallemeyn, even together with Cooper's report, sufficiently

27  answers the materiality question.  Added to this is the fact that

28  in contrast to Dr. Olbrich and Dr. Kallemeyn, Cooper is not an

42 - FINDINGS & RECOMMENDATION

acceptable medical source, but is only an "other source," whose

opinion may or may not be sufficient by itself if it had directly

answered the materiality question.

Defendant's arguments in support of the ALJ's conclusion

regarding the materiality of plaintiff's drug abuse, are

unavailing. While Cooper was aware of plaintiff's opiate use, her

report contains no information whatsoever in support of defendant's

argument that Cooper was aware of plaintiff's pain and her current

prescription for opiate pain relievers. As noted above, Cooper

failed to list the methadone prescription in the section asking her

to list all of plaintiff's prescriptions and there is no express

reference to plaintiff's osteomyelitis, diskitis, or degenerative

disk disease. And, even assuming that a claimant's addiction to

prescribed medications may be subject to the Social Security

Administration's DAA analysis, the issue that Cooper's report fails

to address is what, if any, limitations plaintiff would have if she

took only the pain reliever prescribed to her, and in the

prescribed doses, and alternatively, what, if any, limitations

plaintiff would have if she stopped taking all opiate pain

relievers.

Plaintiff asks that the case be remanded to the ALJ for

further proceedings. This is the proper course given that the

threshold determination of the role of plaintiff's drug addiction

needs to be properly considered. Although not raised by the

parties, the ALJ on remand should consider her duty to fully and

fairly develop the record which is triggered in cases with

ambiguous evidence (such as Cooper's "muddy" report), or when the

record is inadequate to allow for the proper evaluation of the

43 - FINDINGS & RECOMMENDATION

1    evidence.    Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir.

2    2001).    It is possible that re-contacting Dr. Kallemeyn, Dr.

3    Olbrich, and Cooper is appropriate here.

CONCLUSION

5        The Commissioner's decision should be reversed and remanded to

6    the ALJ for further proceedings.

SCHEDULING ORDER

8        The Findings and Recommendation will be referred to a district

9    judge.    Objections, if any, are due June 15, 2010.    If no

10   objections are filed, then the Findings and Recommendation will go

11   under advisement on that date.

12       If objections are filed, then a response is due July 2, 2010.

13   When the response is due or filed, whichever date is earlier, the

14   Findings and Recommendation will go under advisement.

15       IT IS SO ORDERED.

16                   Dated this  28th   day of  May        , 2010.

19                    /s/ Dennis James Hubel
                     Dennis James Hubel
20                   United States Magistrate Judge

44 - FINDINGS & RECOMMENDATION